# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

CONSENSYS SOFTWARE INC.,

*Plaintiff,*

v.

GARY GENSLER, Chair of the U.S. Securities and Exchange Commission; CAROLINE A. CRENSHAW, JAIME LIZÁRRAGA, MARK T. UYEDA, AND HESTER M. PEIRCE, each a Commissioner of the U.S. Securities and Exchange Commission; and U.S. SECURITIES AND EXCHANGE COMMISSION,

*Defendants.*

No. 4:24-cv-00369-O

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

WICK PHILLIPS GOULD & MARTIN, LLP
100 Throckmorton Street, Suite 1500
Fort Worth, Texas 76102
Telephone: (817) 332-7788
Facsimile: (817) 332-7789

Dated: April 29, 2024

## INTRODUCTION

1.      This action is about regulatory overreach, the ambition of the administrative state to control innovative technologies, and elementary principles of fairness and due process.

2.      Plaintiff Consensys Software Inc. ("Consensys") is a software developer whose business centers on a blockchain network called Ethereum.  Users of the Ethereum network pay fees with a digital asset called "ether" or "ETH."

3.      The U.S. Securities and Exchange Commission (the "SEC" or the "Commission") seeks to regulate ETH as a security, even though ETH bears none of the attributes of a security — and even though the SEC has previously told the world that ETH is not a security, and not within the SEC's statutory jurisdiction.  This is the latest step in the SEC's recent campaign to seize control over the future of cryptocurrency, one of the fastest-growing and most innovative technologies in the world.  The SEC seeks to achieve this regulatory dominion through ad hoc enforcement actions against Consensys and others — enforcement actions that would punish Consensys for accepting and acting in reliance on years of government assurance that ETH is not a security.  There is nothing right about this picture.

4.      Developed in 2014, Ethereum is a revolutionary network that permits individual users to transact directly and securely with one another through automated software programs.  For example: borrowers now can complete loan transactions, settled in ETH or other crypto, by satisfying the requirements of a software application on the Ethereum network that facilitates borrowing and lending — without the intermediary of a traditional banking institution.  Artists, writers, and musicians now can sell their work to customers in transactions settled in ETH — without the intermediary of a publisher, gallery, or record label.  All these transactions are immutably recorded on the Ethereum network's ledger — called the blockchain — ensuring that the transactions are secure and transparent.

5.      The Ethereum network is decentralized.  No individual or group of individuals manages Ethereum or directs its affairs.  Ethereum has no management team, no board of directors, no constitutive body of any kind.  Rather, as detailed below, Ethereum is organized and develops democratically through the voluntary participation of a shifting mass of thousands of users, code developers, and other stakeholders.

6.      ETH is the currency that permits users to transact and interact on the Ethereum network.  ETH has none of the features of a security.  ETH represents no claim on the proceeds or revenues of the Ethereum network.  ETH provides no interest in the profits or assets of any enterprise.  Nor is the value of ETH driven by the efforts of any promoter or organization.  No governing board manages ETH or defines its characteristics or terms of use.

7.      In 2018, the SEC definitively declared that ETH is not a security.  Recognizing Ethereum's lack of any centralized managing authority, the SEC's Director of Corporation Finance stated that "current offers and sales of Ether are not securities transactions."  The following year, the Chair of the Commodity Futures Trading Commission (the "CFTC") announced the determination "that ether is a commodity and therefore would fall under our jurisdiction."  His successor reaffirmed: ETH falls "within the commodity regime," not the "security regime." Throughout this period, the SEC and CFTC have repeatedly affirmed that position — in public statements, testimony to Congress, agency enforcement actions, and regulatory actions.  The regulatory consensus was clear: ETH is not a security.

8.      Consensys built its business against the backdrop of this regulatory consensus.  Its products include "MetaMask" wallet software that allows individuals to self-custody their ETH and other digital assets and to direct those assets for use on third-party exchanges and other decentralized applications on Ethereum and other blockchains.  Consensys's software products are

primarily built for Ethereum.  Its business is driven by the broad-scale adoption of the Ethereum network and, in turn, the ability of individuals to use ETH.  Consensys itself acquires, holds, and sells ETH in the ordinary course of its business.

9.      In 2021, a new Administration took power and brought with it a new regulatory agenda.  At first, new SEC leadership asked Congress for more power to regulate crypto.  When Congress declined, the SEC decided to assert that power anyway.  Over the past three years, with no further statutory basis, the SEC has arrogated to itself new powers to regulate cryptocurrencies and the exchanges on which they trade.  Years into its self-appointed campaign of regulatory escalation — and completely contrary to its conclusion six years ago — the SEC now has decided to claim the right to regulate ETH as a security.

10.      The SEC's self-aggrandizing about-face on ETH is notable for its lack of transparency.  In April 2023, Gary Gensler, the Biden Administration's crusading SEC Chair, appeared before the House Financial Services Committee.  The Committee Chairman repeatedly asked Gensler: does the SEC now think ETH is a security?  Gensler refused to answer this direct question from the Chairman of the Congressional committee charged with overseeing his agency. He did not want to admit that his SEC had already secretly cemented its power-grab by issuing an order of investigation designating ETH as a security.

11.      This action challenges the SEC's determination that ETH is a security, subject to SEC jurisdiction.  The SEC is only authorized to regulate securities.  It claims the power to regulate transactions in ETH and other digital asset tokens on the ground that they are "investment contracts" — one of the many enumerated securities identified in the Securities Act of 1933 (the

"Securities Act"). But all "investment contracts" involve a contractual undertaking in which a person invests in an enterprise in exchange for a promise to deliver value from the profits, income, or assets of the business at a future date. Transactions in ETH involve none of these things: no ongoing contractual undertakings, no interest in any enterprise, and no profits derived from the efforts of a centralized promoter. In these respects, ETH is indistinguishable from bitcoin, the sole digital asset that Chairman Gensler remains willing to concede is a commodity and not a security.

12.     Even if the SEC's construction of "investment contract" to include ETH and other digital assets were colorable, the major questions doctrine would require its rejection. Where, as here, an agency claims "to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," it must have "clear congressional authorization." The SEC does not.

13.     The SEC's assertion of jurisdiction over ETH, and the specter of an enforcement action against Consensys for its transactions in ETH, also violate the Constitutional requirement of fair notice under the Due Process Clause. The SEC and the CFTC for years took the position — openly, consistently, and repeatedly — that ETH *is not a security.* Just last month, the CFTC reaffirmed this position in an enforcement action concerning transactions in "digital assets that are commodities, including . . . ether." The SEC's about-face on ETH is the antithesis of fair notice, with businesses — including Consensys — built on the basis of the SEC's previous position (and the CFTC's ongoing insistence) now facing the threat of punitive, even existential, enforcement actions.

14.     The SEC's unlawful seizure of authority over ETH would spell disaster for the Ethereum network, and for Consensys. Every holder of ETH, including Consensys, would fear violating the securities laws if he or she were to transfer ETH on the network. And the ability of

anyone new to acquire ETH to use Ethereum's repository of decentralized applications and services would be extinguished. This would bring use of the Ethereum blockchain in the United States to a halt, crippling one of the internet's greatest innovations.

15. The SEC has now also trained its sights on Consensys's MetaMask wallet software. The SEC claims that by offering this wallet software, Consensys acts as a broker and offers and sells securities. But MetaMask is simply an interface — like a web browser — that allows digital asset holders to seamlessly interact with the Ethereum network, including all other users and applications participating on the network. MetaMask neither holds customers' digital assets nor carries out any transaction functions. No court has found anything like the MetaMask wallet software to be a securities broker.

16. Consensys is built on creating software products that allow people around the world to use and build on top of the Ethereum network, and it is entitled to run its business without the cost, burden, and uncertainty of an unlawful enforcement action. Consensys therefore brings this action seeking declarations that (i) ETH is not a security and Consensys's sales of ETH are not securities transactions; (ii) any investigation or enforcement action against Consensys premised on ETH being a security or ETH transactions being securities transactions would exceed the SEC's regulatory authority and violate the fair notice requirement of the Due Process Clause; (iii) Consensys neither acts as a broker, nor offers or sells securities, through the Swaps and Staking functionality of its MetaMask wallet software; and (iv) any investigation or enforcement action against Consensys premised on it acting as a broker or offering and selling securities through its MetaMask software would exceed the SEC's authority. Consensys further seeks an order enjoining the SEC from investigating or bringing an enforcement action either with respect to its sales of ETH or as to MetaMask.

## PARTIES

17.     Plaintiff Consensys is a corporation organized under the laws of Delaware and headquartered in Fort Worth, Texas.  Consensys is a leading developer of blockchain and web3 software solutions.  Its software products include MetaMask, a popular non-custodial wallet application that allows users to manage their digital assets, interact with decentralized applications, and securely store their private keys.

18.     Defendant Gary Gensler is the Chair of the SEC.  Chair Gensler is named in his official capacity only.

19.     Defendant Caroline A. Crenshaw is a Commissioner of the SEC.  Commissioner Crenshaw is named in her official capacity only.

20.     Defendant Jaime Lizárraga is a Commissioner of the SEC.  Commissioner Lizárraga is named in his official capacity only.

21.     Defendant Mark T. Uyeda is a Commissioner of the SEC.  Commissioner Uyeda is named in his official capacity only.

22.     Defendant Hester M. Peirce is a Commissioner of the SEC.  Commissioner Peirce is named in her official capacity only.

23.     Defendant the U.S. Securities and Exchange Commission is an agency of the U.S. federal government.

## JURISDICTION AND VENUE

24.     This action arises under the Constitution, the federal courts' equitable powers, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*, the Securities Act, 15 U.S.C. § 77a *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act").  This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1331.

25.     Venue is proper in this district because Plaintiff Consensys maintains its principal place of business in this district and division at 5049 Edwards Ranch Road, Fort Worth, TX 76109, and no real property is involved in this action.

## BACKGROUND

### A.     Blockchains and digital assets

26.     A blockchain is a distributed peer-to-peer electronic ledger or database maintained on a decentralized basis by numerous computers within a network.  Unlike traditional ledgers that record transactions, a blockchain "ledger" is "distributed" in the sense that it is shared and instantly synchronized across multiple computers, with public copies of the ledger accessible by multiple users at the same time.  The ledger is "peer-to-peer" in the sense that no central authority controls the network.  When a user submits a transaction to the ledger, the entry is immediately available to all other users without any central organizing function or administrator.

27.     These attributes distinguish blockchain technology from all previous forms of transactional recordkeeping.  Because it is distributed across computers globally, with no centralized organizing function, the blockchain is vulnerable to no one point of malicious cyberattack or failure.  Because all transactions are recorded publicly, the blockchain is far more transparent than traditional forms of transactional recordkeeping.  Because it is peer-to-peer, the blockchain is far more accessible than traditional forms of transactional recordkeeping.  Because the blockchain software is publicly available and can be used by anyone to build new applications on the network, third-party decentralized applications on the blockchain are proliferating around the world.  Blockchain technology has been utilized by individuals and enterprises to secure financial transactions, manage supply chains, issue stablecoins, store data, and verify identities, among other applications.

28.     Every blockchain has its own "native" or "base" "token" — also referred to as a "digital asset," "cryptoasset," or "cryptocurrency."  These tokens give their holders the ability to access an application or service on the blockchain.  The blockchain records ownership of tokens through public alphanumeric addresses.  The owner holds a unique "private key" to that public address that allows them to transact in the tokens held at that address.  Token holders are accordingly able to use their tokens to participate in activities on the blockchain.

29.     The transactions on a public blockchain are confirmed by the participants in that blockchain's transaction verification process or "consensus mechanism."  The job of these validators is to ensure that transactions undertaken on the blockchain are accurately and securely recorded on the ledger.  Before a transaction is entered on the blockchain, validators must reach a consensus on the transactions to add to the ledger.  Blockchains generally employ one of two consensus mechanisms: "proof of work" or "proof of stake."

30.     In a proof-of-work network, for each "block" of transactions to be validated, "miners" race with one another to solve a computational puzzle for the right to validate a given transaction proposed for addition to the blockchain and earn rewards.  In a proof-of-stake network, validators "stake" some of their blockchain tokens — posting the tokens as a bond — while they verify new transactions proposed to be added to the blockchain.  If a validator violates the rules of the network, for example by proposing the addition to the blockchain of a fake transaction or one that lacks the requisite valid digital signature from each party, that validator risks losing some or all of its staked assets — a way to deter bad actors.  Under both proof-of-work and proof-of-stake programs, validators can earn additional tokens as a fee for validating other users' transactions and maintaining consensus as to the history of transactions on the blockchain.

31.     The first major blockchain network, Bitcoin, was invented in 2008.  Until recently, the sole function of the Bitcoin blockchain was to record transactions in its native token, bitcoin, allowing holders of the bitcoin token to use it as a medium of exchange and store of value.  Another major digital asset network, Ethereum, was launched in 2015.

32.     In the years since the launch of Bitcoin and Ethereum along with their native tokens, thousands of other crypto tokens have been developed, with a variety of functions and uses.  Many, like bitcoin, function primarily as digital currency, providing means to transfer funds, pay for products and services, and store value — all without an intermediary like a bank.  Others provide their owners with utility linked to a specific network, making possible the use of various products and services offered on the network.  And other tokens with so-called "governance" attributes can be used to cast votes on proposed changes to a network's code and thus its functionality.

33.     The digital asset industry has become a significant economic force.  At least one in five adults in the United States owns crypto today.  Digital assets have achieved a market capitalization of over $2 trillion.  Hundreds of millions of people globally use cryptoassets for financial and non-financial purposes.  Ethereum is used by tens of millions of people to complete over a million transactions daily, and ETH alone has a market value of almost $400 billion.  Participation in Ethereum is expanding rapidly, as innovators continue to build new applications on Ethereum, including traditional financial institutions like BlackRock, which launched its first digital asset product on Ethereum last month.

### B.     The Ethereum Network

34.     Ethereum was developed to expand the distributed ledger concept of Bitcoin and other blockchains to applications beyond money.  Ethereum enables anyone to develop and run automated software programs stored on the blockchain — known as "smart contracts" — while maintaining a permanent record of all transactions on the network.  Smart contracts automatically

perform predetermined actions when their conditions are met, without human intervention.  The execution of a smart contract's if/then logic is often analogized to the operation of a vending machine: when a user inserts a dollar and pushes B4, a Snickers bar drops into the bin.  In the same way, users of the Ethereum network can commit their ETH, enter a computer instruction, and receive a product or service in automatic response.  Ethereum thus permits developers to create countless applications — from games to marketplaces — that, unlike traditional transactions, require no intermediation and, unlike traditional computer applications, do not sit on centralized servers.  So, for example, individuals can use ETH to buy distributed data storage from a decentralized application sitting on Ethereum, with buyers and sellers interacting with no human intermediary — only smart contracts.

35.    At the heart of Ethereum's design is its native token, ether or ETH.  To conduct a transaction on the Ethereum blockchain, users pay a fee in fractions of ETH.  Validators are paid in ETH to process and verify user transactions.  The imposition of fees in ETH for transactions on Ethereum is critical to the network's security and long-term viability: if Ethereum transactions were free, there would be no cost to transmitting an inordinate number of transactions, leading to denial-of-service attacks where attackers cheaply overload the network and make it unusable.

36.    The Ethereum network operates without a formal governance structure or governing body.  Instead, decisions are made through rough consensus among the network's stakeholders, including ETH holders and application users and developers.  Anyone can propose changes to Ethereum's operating protocol through a process called "Ethereum Improvement Proposals."  Proposals to change the network are debated in public forums, including open internet forums and in-person conferences, with the goal of achieving broad consensus.  The process operates in stages and is democratic: a proposal may be revised and re-submitted over time by its

"champion" to incorporate Ethereum community feedback. If a proposal fails to capture community interest, as many do, it will be abandoned. But if an idea commands broad consensus within the Ethereum community, then dispersed Ethereum code developers volunteer to participate in preparing and testing the code needed to implement the proposal. If the proposal proves viable, the Ethereum network will be updated and then all Ethereum network participants have the option to implement the update in running their nodes or their decentralized applications.

37.     An illustration of Ethereum's decentralized governance process involved its migration in 2022 from a proof-of-work to a proof-of-stake validation mechanism — a change referred to as "the Merge." This complex technical shift was years in the making. It began as an Ethereum Improvement Proposal and, after extensive debate, generated widespread consensus among Ethereum stakeholders — ranging from leading code developers to ETH token holders — to implement a roadmap of changes to the network's protocols. No single person or body had central authority or was designated as a decision-maker to plan or implement the Merge. By eliminating the use of intense computational exercises to validate transactions, the Merge decreased Ethereum's electricity use by 99.9%.

### C.     Consensys's business

38.     Consensys develops software for blockchains. It employs over 800 people globally, including over 340 in the United States. Consensys's products help individual users and enterprises build and use next-generation web applications and participate in the decentralized web.

39.     Many of Consensys's software products are built for Ethereum; Ethereum is therefore critical to Consensys's mission. So is ETH. The consumers and developers that use Consensys's software for Ethereum must use ETH to transact on the blockchain. Consensys holds ETH in the ordinary course of its business, including ETH received from customers as payment

for its offerings.  Consensys sells ETH as a normal part of its treasury operations, to maintain sufficient cash and cash equivalents on its balance sheet.

40.     Consensys's software products include MetaMask.  MetaMask is free "wallet" software — in the form of a browser extension or mobile application — that facilitates access to users' self-custodied digital assets (technically, it enables users to hold the "private keys" for tokens that are recorded on the blockchain).  The MetaMask wallet software is "self-hosted" or "non-custodial," which means that the software provides a user with a means to store, manage, and secure private keys locally — entirely on the user's own device.  Consensys never holds and cannot access a user's private keys and other data.

41.     MetaMask provides a user-friendly software interface to Ethereum and other blockchain networks.  Transacting on Ethereum requires composing and encrypting instructions in computer-readable language.  The wallet software enables users to avoid having to manually compose those instructions and instead provides users with an intuitive interface through which they can input commands that are then used to generate the appropriate code for submitting transactions to the blockchains.  MetaMask thus provides users a seamless and simple way to read blockchain data, send ETH from one address to another, and interact with third-party decentralized applications, much like a web browser allows one to surf the internet without having to know command-line computer instructions.

42.     Two core features of this wallet platform are MetaMask Swaps and MetaMask Staking.

43.     ***MetaMask Swaps*** is an application that allows users to communicate with third-party decentralized exchanges ("DEXs") where they can buy, sell, or exchange tokens.  MetaMask

Swaps allows a user to see pricing information for tokens from DEXs and third-party aggregators and communicates the user's commands to DEXs to carry out transactions.

44.     MetaMask Swaps software itself does not execute transactions and never comes into possession of users' digital assets.  It simply displays pricing information collected from third-party aggregators and sends user commands to DEXs, which execute the transactions.

45.     Consensys charges a 0.875% service fee in connection with certain successful transactions for use of the Swaps software.

46.     ***MetaMask Staking*** is an application that allows users to communicate with certain third-party protocols called Lido and Rocket Pool, each of which offers a "liquid staking service" for validating transactions on the Ethereum blockchain.  Lido and Rocket Pool allow users to deposit ETH into a pool and, through a series of smart contracts, Lido and Rocket Pool will automatically stake users' assets and allow them to earn Ethereum network rewards and transaction fees in return for participating in this blockchain validation service.  While their digital assets are staked, users receive from Lido or Rocket Pool a tokenized version of the staked tokens.  These tokens, like any other token, can be swapped for other crypto or money, and also give the holder the right to withdraw ETH from the liquid staking protocol.

47.     MetaMask Staking is thus an interface to facilitate users' communications with these third-party protocols, which in turn allow users to deposit ETH for staking and receive a tokenized version of the staked digital asset in return.  Like the rest of the MetaMask wallet software, the MetaMask Staking feature is entirely non-custodial; at no point does Consensys come into possession, custody, or control of a user's tokens, nor can it alter in any way the user's transaction instructions to the protocol.

**D.      The SEC's authority and its limits**

48.      The SEC is a federal agency whose authority to regulate is limited to transactions in "securities."   The term "securities" is statutorily defined to embrace an enumerated set of financial instruments, including "stocks," "bonds," and similar investments.   Most economic transactions are not transactions in securities.   Nor are most investments necessarily investments in securities.   Commodities, like gold or soybeans, are fundamentally distinguishable from securities even though, like securities, they are traded by investors on public markets. Commodities markets and products are regulated by the CFTC, not by the SEC.   As the CFTC Chair put it, the question is whether the product "fall[s] within the commodity regime or the security regime" — they are mutually exclusive.

49.      Securities are investments in a business enterprise backed by a managerial commitment.   Securities offer their holders the prospect of a return derived from the income, profits, or assets of the enterprise.   Commodities, by contrast, are not investments in an enterprise backed by a managerial commitment, and do not offer a return derived from the operations of the enterprise.   Their value is derived from the trading price available in the market, by the forces of supply and demand, not the performance or commitments of management.

**E.      The SEC acknowledges that ETH is not a security**

50.      For years following the first cryptocurrency's introduction, the SEC claimed no authority to regulate cryptoassets.   Many cryptocurrencies were in broad circulation before the SEC suggested it might have regulatory authority over any transactions in any of them.   And even then, both the SEC and CFTC repeatedly affirmed that ETH, specifically, is *not* a security.

51.      The SEC confirmed that ETH is not a security in June 2018 in a speech delivered by William Hinman, the Director of the SEC's Division of Corporation Finance, the division responsible for regulatory activities concerning issues relating to the definition of a "security" and

for advising the Commission on these issues.  Hinman declared that while a digital asset representing a "financial interest in an enterprise" might be "a digital asset offered as a security," a token "can, over time, become something other than a security."  Specifically, Hinman said a digital token used to purchase goods and services within a "sufficiently decentralized" network would cease to be a security.  He went on to explain that a sufficiently decentralized network was one "where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts."  In that situation, Hinman said, "the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful."  The SEC's regulatory authority would in that circumstance fall away.

52.     In his speech, Hinman confirmed the SEC's conclusion that ETH is not a security. He explained: "[B]ased on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions."

53.     In an interview on CNBC the next day, Hinman reemphasized that ETH is not a security:  "When we look . . . at ether and the highly decentralized nature of the network[] we don't see a third-party promoter where applying the disclosure regime would make a lot of sense.  So we're comfortable . . . viewing these as items that don't have to be regulated as securities."

54.     Hinman's representations about ETH reflected the considered judgment of the SEC and its leadership.  As internal Commission documents made public have revealed, Hinman's use of the plural "we" reflected the approval Hinman received from the highest ranks of SEC officials — including then-Chair Jay Clayton — before he publicly declared ETH not to be a security. When Hinman circulated the speech draft, he bracketed the portion about Ethereum and ETH and said he would only keep the language "if we [at the SEC] all are in agreement."

55.     In the wake of this announcement, then-Chair Clayton endorsed Hinman's speech as "the approach [the SEC] staff takes to evaluate whether a digital asset is a security" and encouraged people "to take a look at Bill [Hinman]'s speech."  SEC Commissioner Peirce, too, embraced Hinman's framework, noting that "[o]nce 'a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosure becomes less meaningful' and offers and sales of tokens are no longer subject to the securities laws."

56.     In 2019, the SEC staff published a "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework").  The Framework memorialized many of the key points outlined in Hinman's speech, including his emphasis on whether the network is "decentralized." In particular, the Framework noted that a digital asset was not likely to be a security if it was governed by "an unaffiliated, dispersed community of network users (commonly known as a 'decentralized' network)."

57.     The SEC's 2018 declaration that ETH is not a security, and therefore not subject to SEC jurisdiction, was widely understood and uncontroversial.  Chair Gensler, then a professor at the Massachusetts Institute of Technology, told a gathering of investors in 2018 that "Bitcoin, ether, Litecoin and Bitcoin Cash" are "not securities."  Similarly, then-Professor Gensler told his students in a course on blockchains and digital assets that "in 2018 the Securities and Exchange Commission has said that regardless of what [ether] might have been in '14, it's now sufficiently decentralized that we'll consider it not a security."

58.     And just last fall, the SEC declared effective registration statements for nine Exchange Traded Funds intended to hold ETH futures contracts that are traded on commodities exchanges.  The CFTC approved those ETH futures contracts to trade on commodities exchanges on the basis that they were futures contracts based on a commodity, not a security.  By approving

the Exchange Traded Funds that hold those contracts, the SEC explicitly endorsed the CFTC's view that ETH is a commodity, not a security.

**F.     The CFTC agrees that ETH is a commodity, not a security**

59.     Like the SEC, the CFTC also has consistently concluded that ETH is a commodity, not a security.  In 2019, then-Chair of the CFTC, Heath Tarbert, stated: "Ether is a commodity, and therefore it will be regulated under the [Commodity Exchange Act]."  Based on that position, since February 2021, the CFTC has permitted futures contracts for ETH to trade on the Chicago Mercantile Exchange.

60.     The CFTC has repeatedly reaffirmed its determination that ETH is a commodity and not a security, including through approval of additional ETH commodity futures contracts, in CFTC enforcement actions, and in statements by Commissioners.  Testifying in oversight hearings, CFTC Chair Rostin Behnam told the Senate that "when ether futures were listed . . . both the exchange and the [CFTC] thought very deeply and thoughtfully about 'what is the product?' and 'does it fall within the commodity regime or the security regime?' — concluding, "We would not have allowed the ether futures product to be listed on a CFTC exchange if we did not feel strongly that it was a commodity asset."  In further testimony last month, Chair Behnam observed that the "conclusion that Ether is a commodity" was a "years-old decision" that has served markets well.  CFTC Commissioner Caroline Pham has similarly stated publicly that ETH is a "digital asset commodit[y]."

61.     CFTC Director of Enforcement Ian McGinley told leading practitioners in a widely reported keynote address on September 11, 2023, that ETH would be regulated as a commodity, just like "gold, wheat or oil futures and options."

62.     Acting on its determination that ETH is a commodity, subject to CFTC rather than SEC regulation, the CFTC has launched multiple enforcement actions concerning the sale of ETH.

In a proceeding before a federal judge in this State, the CFTC procured an order declaring that "ether . . . [is a] 'commodit[y]' pursuant to 7 U.S.C. § 1a(9)" — the Commodity Exchange Act. Order of Final Judgment by Default, *CFTC* v. *Laino Grp. Ltd. d/b/a PaxForex*, Case No. 4:20-cv-03317, ECF No. 21 at ¶ 43 (S.D. Tex. June 30, 2021). In each of the cases cited in the margin, the CFTC has similarly told federal judges that ETH is a commodity (not a security), subject to CFTC jurisdiction.[1]

### G.   The SEC makes a crypto regulatory power grab

63.   In early 2021, shortly after assuming office, President Biden nominated Gary Gensler as Chair of the SEC. In May 2021, immediately following his confirmation, Gensler told Congress that the SEC lacked regulatory authority over crypto exchanges and called on the legislature to supply his agency with a broad regulatory mandate. Congress declined. But the SEC under Gensler decided to take the authority anyway. In August 2021, within months of becoming the SEC's Chair, Gensler vowed to "take [the agency's] authorities as far as they go" in pursuit of crypto. Soon thereafter, the SEC doubled the size of its crypto enforcement unit and ramped up investigations of participants in the digital asset market.

---

[1] *See* Amended Complaint, *CFTC* v. *Bankman-Fried*, Case No. 1:22-cv-10503, ECF No. 13 at ¶ 23 (S.D.N.Y. Dec. 21, 2022) ("Digital assets such as including bitcoin (BTC), ether (ETH), tether (USDT) and others are 'commodities' as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9)"); Complaint, *CFTC* v. *Temurian*, Case No. 1:23-cv-01235, ECF No. 1 at ¶ 1 (E.D.N.Y. Feb. 15, 2023) (charging defendants with fraud "in connection with the sale of digital assets that are commodities, such as Bitcoin and Ether"); Complaint, *CFTC* v. *Zhao*, No. 1:23-cv-01887, ECF No. 1 at ¶¶ 2, 24 (N.D. Ill. Mar. 27, 2023) (alleging that bitcoin, ether, Litecoin, Tether, and some "other virtual currencies" are "commodities" under the Commodity Exchange Act); Complaint, *CFTC* v. *Russell*, No. 23-cv-2691, ECF No. 1 at ¶ 12 (E.D.N.Y. Apr. 11, 2023) (alleging that "[c]ertain digital assets, including bitcoin, ether and USDC, are 'commodities'" under the Commodity Exchange Act); Complaint, *CFTC* v. *MEK Global Ltd.*, Case No. 24-cv-2255, ECF No. 1 at ¶ 2 (S.D.N.Y. Mar. 26, 2024) (alleging that exchange transactions involved "digital assets that are commodities, including . . . ether (ETH)").

64.     Instead of regulating by rulemaking, the SEC has chosen to bring dozens of cryptocurrency-related enforcement actions in assorted jurisdictions, many against smaller-scale or under-capitalized defendants unable to defend against the SEC's aggressive litigation stance. As the actions mounted, SEC Commissioner Peirce noted the unfairness of regulating by enforcement rather than rulemaking: "Using enforcement actions to tell people what the law is in an emerging industry," she observed, is not a "fair way of regulating" — "one-off enforcement actions and cookie-cutter analysis does not cut it."  She has also stated that "if we seriously grappled with the legal analysis and our statutory authority, as we would have to do in a rulemaking, we would have to admit that we likely need more, or at least more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us."  Most recently, Commissioner Peirce joined Commissioner Uyeda to criticize as "fiction" the SEC's claim to have provided "clarity on which crypto assets are securities" with standards that "are so opaque and arbitrary that the Commission itself is unwilling to stand by its own analysis."

65.     Chair Gensler's SEC has little interest in public comment or forward-looking rulemaking addressing the crypto industry.  The agency denied a recent petition for rulemaking asking it to spell out its position and accompanying guidance, and has ignored comments seeking clarification about how recent regulations apply to firms operating in the crypto space.  The agency is determined to answer to no one.

### H.     Consensys becomes a target

66.     On April 4, 2022, Consensys received a letter from the SEC's Division of Enforcement staff advising it that the staff was "conducting an investigation" of MetaMask.  The SEC requested that Consensys voluntarily provide answers to a number of broad requests for information regarding MetaMask, including MetaMask Swaps.  The SEC made additional requests

for information by letter and on calls.  Consensys diligently cooperated throughout this period, at significant effort and expense, providing a detailed account of certain of its software products and operations.

67.     While that investigation was ongoing, on September 21, 2022, Consensys received another letter from the SEC staff advising that the agency was conducting an investigation into certain staking protocols on the Ethereum network and requesting voluntary responses to its questions.  Although the SEC did not initially indicate that Consensys was a target of this investigation, through subsequent letters and communications the SEC staff came to focus its requests for information and documents on MetaMask Staking.  As with the SEC staff's investigation into MetaMask Swaps, Consensys diligently cooperated at significant expense.

68.     On April 10, 2024, the SEC staff sent Consensys a "Wells Notice" stating its intent to imminently recommend that the Commission bring an enforcement action against Consensys for violating the federal securities laws through its MetaMask Swaps and MetaMask Staking products.  In a telephone conference that same day, the SEC staff stated its view that Consensys, by operating the MetaMask Swaps software, is an unregistered broker-dealer in violation of Section 15(a) of the Exchange Act.  The SEC staff also stated its view that Consensys, in connection with its MetaMask Staking program, violates both Sections 5(a) and 5(c) of the Securities Act by engaging in the offer and sale of unregistered securities and violates Section 15(a) of the Exchange Act by acting as an unregistered broker-dealer.

I.     **The SEC puts ETH and Consensys in its crosshairs**

69.     The SEC, meanwhile, has also sought to appoint itself regulator of ETH: a digital asset the SEC, the CFTC, and the public at large had long understood fell outside the SEC's grasp.

70.     Beginning in early 2023, Chair Gensler backtracked from the SEC's prior statement that ETH is not a security, stating in February that among cryptocurrencies "everything but Bitcoin" could be a security.  Chair Gensler sowed further confusion a few weeks later when he asserted that any developers "promoting" proof-of-stake protocols, like Ethereum's, would need "to come into compliance" with securities regulation.  And the following month, when testifying before the House Financial Services Committee, Gensler pointedly refused to answer — even in the face of repeated questioning by the Committee's chair — whether he considered ETH to be a security.

71.     Unwilling to state its position publicly, by early 2023 the SEC had already made what it knew would be a destabilizing reversal of its declaration that ETH was not a security.  On March 28, 2023, Gurbir Grewal, Director of the Division of Enforcement, approved the Formal Order of Investigation in the matter of "Ethereum 2.0" (the "Formal Order"), delegating to the SEC staff broader authority to investigate and subpoena individuals and entities involved in the buying or selling of ETH.  The Commission affirmed the issuance of the Formal Order shortly thereafter on April 13, 2023.  The Formal Order predicates this delegation on the SEC's information showing possible offers and sales, since at least 2018, of "certain securities, including, but not limited to ETH, as to which no registration statement was or is in effect . . . and for which no exemption was or is available."

72.     Over the last year, the SEC has issued numerous subpoenas pursuant to its Formal Order.  Consensys itself received three subpoenas in 2023 containing two dozen distinct requests for information, many comprising several detailed sub-requests.  The subpoenas do not just seek information on Consensys's acquisitions, holdings, and sales of ETH.  They also seek detailed information concerning the role of Consensys, including its software developers, in a host of

Ethereum Improvement Proposals related to the Ethereum Merge, the transition from a proof-of-work to a proof-of-stake validation mechanism.  These subpoena categories include information on Consensys meetings with third parties, communications with all Consensys customers, a list of the names of any Consensys developers who contributed to any coding related to the proposals, and the identity of all public and private repositories that Consensys developers contributed to in connection with their coding.  As with the SEC staff's investigation into MetaMask, Consensys again diligently cooperated at significant expense.  Consensys has made at least eight document productions, totaling over 88,000 pages.  The SEC has also requested testimony from at least one senior officer of Consensys concerning the company's sales of ETH.

73.     The SEC staff has communicated to Consensys that the agency is investigating whether Consensys's current offers and sales of ETH — transactions carried out from its own holdings as part of its normal treasury operations — are securities transactions.  And the staff recently requested that Consensys make a "proffer" to the SEC to state why Consensys believes its ETH sales are not securities transactions.

74.     Despite requests for clarification, the staff has declined to explain why the SEC believes Consensys's sales of ETH may violate securities law or why the agency believes it now has jurisdiction over ETH.  Instead, the SEC has elected to shroud the reversal of its position in secrecy, seeking to maintain a tactical advantage as it moves forward with its unprecedented land grab.

75.     The SEC's "Ethereum 2.0" investigation has only escalated in the year since the Formal Order issued.  Just last month, the SEC served yet another document subpoena on Consensys.  The subpoena categories include all documents and communications between Consensys and any secondary trading platforms as well as other third parties concerning the

Merge, the ongoing development of the Ethereum blockchain, and Consensys's role as a validator for Ethereum.  And in requesting an interview with the company's acting chief financial officer, the staff indicated that it will serve a testimonial subpoena if the executive does not submit voluntarily and promptly.  There can be no doubt, then, that the SEC's review of the tens of thousands of pages of documents already produced by Consensys and of the voluminous publicly available information about Ethereum has not dissuaded the SEC from its unlawful investigation. In fact, the opposite: the SEC's investigation has entered a new, broader phase in recent weeks.

76.     According to widespread news coverage, the SEC recently unleashed a series of additional subpoenas to other crypto companies as part of the "Ethereum 2.0" investigation.  As one news report warned, "If the SEC goes ahead with its plan to declare that all of Ethereum is subject to its securities laws, it will have broad and unpredictable consequences."

**J.     The SEC assertion of jurisdiction over ETH is unlawful**

77.     Contrary to its previously confirmed position, the SEC now claims that ETH is a security subject to SEC regulation.  The SEC's claim of jurisdiction rests on the claim that transactions in ETH involve an "investment contract" as that term appears in the securities laws. That position is not supported by the facts and not permitted under the law.  And the SEC's determination to carry out its agenda through burdensome investigations and punitive retroactive enforcement actions after years of assurances that ETH was not a security violates the Constitution.

**1.     Ether transactions are not "investment contracts"**

78.     For an investment to constitute an "investment contract" it must include a contractual undertaking to deliver value at a later date.

79.     Consensys's sales of ETH lack any such contractual undertaking.  There are no commitments made to the buyer — whether by Consensys or anyone else — to deliver any future

value.  And unlike traditional debt or equity securities, ETH holders have no expectation in the income, profits, or assets of any business.

80.     Moreover, investment contracts, like all securities, involve passive investments in which holders rely on the efforts of a centralized manager or promoter for their investment profit. But in the case of ETH, no such central manager or promoter even exists.  Indeed, it is the Ethereum blockchain's decentralization that the SEC rightly cited in concluding that ETH fell outside its jurisdiction.  The Ethereum network has since grown more decentralized.  By the end of 2023, nearly 8,000 individuals from around the world were actively involved on a monthly basis in developing code for this global computing platform.

81.     Even were there doubt whether ETH qualified as an "investment contract," the SEC's claim to authority would still fail.  Digital assets are a trillion-dollar market, with one in five American adults holding crypto.  The market value of ETH alone is almost $400 billion, and the economic scale of the decentralized internet, built on the foundation of Ethereum, is even greater.  The SEC lacks the "clear congressional authorization" required under the major questions doctrine to regulate this industry of "vast 'economic and political significance,'" let alone to regulate all investments accompanied only by a hope of gain but no contractual undertaking, which the SEC claims authority to sweep within its jurisdiction.

### 2.     Consensys did not have fair notice

82.     The SEC's land grab also violates core principles of due process and fair notice. Essential to due process is the "fundamental principle . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

83.     The SEC's position on ETH is the antithesis of fair notice, reversing years of public statements and regulatory actions in which both the SEC and CFTC have taken the *exact opposite*

*position*.  In reliance on the SEC's and CFTC's assurances that ETH is not a security, the Ethereum blockchain has grown to be the backbone of the digital assets industry.  Many of the most significant utilizations of blockchain technology have been built on Ethereum, from large-scale DEXs, like Uniswap, to popular stablecoins, such as USDC.  Even traditional financial institutions like BlackRock and UBS have launched digital asset products on the Ethereum network.

84.  Consensys, in particular, has built its business around the Ethereum blockchain, launching features like MetaMask Swaps in 2020 and MetaMask Staking in 2023 — that is, years after the SEC assured the public it viewed ETH as outside its domain — aimed at reaching the growing number of Ethereum users.  Consensys has done so in reliance on the SEC's and CFTC's repeated statements that ETH is not a security.

85.  Consensys and other industry actors were entirely justified to and did rely in good faith upon the SEC's and CFTC's actions and words.  The SEC's efforts to pull the rug out now by deeming ETH a security violate the requirement of fair notice.

**K.    MetaMask Swaps and Staking do not violate securities law**

86.  Consistent with its broader anti-crypto crusade, the SEC also contends that Consensys has violated the securities laws merely by offering its MetaMask software — an interface for users to interact with Ethereum's decentralized network — to the public.  Specifically, as to both the Swaps and Staking feature of the MetaMask wallet, the SEC contends that Consensys operates as an unregistered "broker" in violation of Section 15 of the Exchange Act.  Additionally, as to MetaMask Staking alone, the SEC contends that Consensys has sold or offered to sell an unregistered security in violation of Section 5 of the Securities Act.

87.  These accusations fail because the digital asset transactions at issue are, like the ETH transactions described above, not securities transactions falling within the purview of the federal securities laws.  But even setting this objection aside, the charges are absurd — and for a

simple reason: Both MetaMask Swaps and Staking are software that help users interact directly with third-party protocols on the Ethereum blockchain. Nothing more, nothing less. The notion that they could cause Consensys to operate as either a broker or seller of securities is contrary to precedent and common sense.

88. As to Swaps, the software simply provides a convenient and user-friendly interface for interacting with third-party DEXs. While MetaMask helps users search and compare prices by aggregating quotes from different third-party liquidity providers, "providing pricing comparisons does not rise to the level of routing or making investment recommendations." *SEC* v. *Coinbase, Inc.*, 2024 WL 1304037, at *35 (S.D.N.Y. Mar. 27, 2024). In other words, "merely providing information or bringing two sophisticated parties together" is not broker activity. *Rhee* v. *SHVMS, LLC*, 2023 WL 3319532, at *8 (S.D.N.Y. May 8, 2023).

89. The same applies to MetaMask Staking. As with Swaps, Staking is an interface for interacting with third-party liquid staking platforms. It does not direct how trades should be executed or engage in any of the other routing activities courts have recognized as traditionally carried out by brokers.

90. The SEC's charge that the MetaMask Staking software offers or sells unregistered securities is similarly baseless. Even assuming for the sake of argument that liquid staking involves a transaction in a security — and it does not — MetaMask Staking plays no significant role in the sale of liquid staking services. Nor does Consensys ever hold or otherwise control ETH or liquid staking tokens as part of any user transaction. All MetaMask Staking does is provide the equivalent of a webpage through which users can learn about and link to these third-party services. The SEC's accusations to the contrary only further illustrate what little regard the SEC gives to the limits of its statutory purview.

### GROUNDS FOR RELIEF

### Count One
### (Agency Action in Excess of Statutory Authority)

91.     Consensys incorporates by reference all allegations above.

92.     A plaintiff may "institute a non-statutory review action" against an agency head "for allegedly exceeding his statutory authority." *Chamber of Com. of U.S.* v. *Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996).

93.     The Commission's authority to empower its staff to conduct an investigation, including to subpoena witnesses and take evidence, is limited to those "necessary and proper for the enforcement of" the Securities Act. 15 U.S.C. § 77s(c).

94.     ETH is not a security under the Securities Act and transactions in ETH are not securities transactions.

95.     The issuance of the Formal Order, pursuant to which the Commission authorized an investigation into Consensys's sales of its ETH holdings, was predicated on the Commission's unlawful determination that ETH is a security and there may have been sales of unregistered securities, including ETH, within the meaning of the Securities Act.

96.     Consensys has been subject to a coercive investigation by the Commission's staff pursuant to the Formal Order's unlawful delegation of authority.  Being subject to an unlawful "formal investigation" is a "'here-and-now' injury that can be remedied by a court." *Free Enter. Fund* v. *Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 487, 513 (2010).  That injury will continue so long as the Formal Order is not rescinded or the investigation into Consensys's ETH sales continues.  *See Blinder, Robinson & Co.* v. *S.E.C.*, 692 F.2d 102, 106 (10th Cir. 1982).

97.     The Formal Order confirms that the SEC now believes ETH is a security.  The SEC's position poses a genuine threat to Consensys of an enforcement action regarding its past

and future business operations and the further risk of attendant liability.  Moreover, on information and belief, the SEC has determined to pursue enforcement actions against market participants, including Consensys, alleging that their transactions in ETH violate the securities laws.  There exists between the parties an actual controversy regarding whether ETH is a security.

98.    Actions taken by an agency or official that are "*ultra vires*" may appropriately "be made the object of specific relief."  *Apter* v. *Dep't of Health & Human Servs.*, 80 F.4th 579, 587 (5th Cir. 2023).

99.    Accordingly, Consensys is entitled to declaratory and injunctive relief preventing the SEC from continuing any investigation or commencing an enforcement action against Consensys based on the premise that Consensys's transactions in ETH are securities transactions.

100.    Consensys has no adequate remedy at law.

## Count Two
### (Agency Action in Violation of the Due Process Clause)

101.    Consensys incorporates by reference all allegations above.

102.    A court may order injunctive relief to "prevent[] [an] entit[y] from acting unconstitutionally." *Corr. Servs. Corp.* v. *Malesko*, 534 U.S. 61, 74 (2001).  Similarly, courts, in their equitable authority, may declare invalid agency actions found not to be "rationally based." *Texas Rural Legal Aid, Inc.* v. *Legal Servs. Corp.*, 940 F.2d 685, 697 (D.C. Cir. 1991).

103.    The SEC's investigation into transactions in ETH is predicated on a determination that ETH is a security, in contradiction to the long-held position set out by both the SEC and CFTC that ETH is a commodity falling within the jurisdiction of the CFTC, and not a security regulated by the SEC.  Consensys has relied in good faith on the previously established position.  Accordingly, the SEC's investigation is, and any enforcement action premised on that

investigation would be, unlawful and in violation of the requirement of fair notice under the Constitution's Due Process Clause.

104.    Because the SEC's characterization of ETH as a security and ETH transactions as securities transactions violates the requirement of fair notice, Consensys is entitled to declaratory and injunctive relief preventing the SEC from continuing any investigation or commencing an enforcement action based on the premise that Consensys's transactions in ETH are securities transactions.

105.    Consensys has no adequate remedy at law.

**Count Three**
**(Agency Action in Violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706)**

106.    Consensys incorporates by reference all allegations above.

107.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction, authority, or limitation, or short of statutory right."  5 U.S.C. § 706(2)(A)-(C).

108.    The Formal Order constitutes final agency action reviewable under the APA.  *See* 5 U.S.C. § 701.  It possesses statutory "[f]inality," 15 U.S.C. § 78d–1(c), and bears "legal consequences" insofar as it empowers SEC staff to engage in coercive fact finding, *Bennett* v. *Spear*, 520 U.S. 154, 178 (1997).

109.    Federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc.* v. *NLRB*, 522 U.S. 359, 374 (1998).

110.    ETH is not a security under the Securities Act, and therefore the Formal Order exceeds the SEC's statutory authority.

111.    The SEC and the CFTC have previously recognized that ETH is a commodity that falls within the CFTC's authority.  The Formal Order, which is predicated on a characterization of ETH as a security, represents a sharp departure from that previous position and reflects the SEC's efforts to treat ETH transactions as securities transactions in future enforcement proceedings.  This constitutes arbitrary and capricious agency action insofar as the SEC is invoking its investigatory authority to create new policy, in contravention of well-settled expectations, without fair warning.  Moreover, invocation of the agency's investigatory authority in this manner violates due process.

112.    Each of these flaws renders the Formal Order and the coercive authority exercised by the SEC staff pursuant to its delegation legally invalid.

113.    Consensys is therefore entitled to declaratory and injunctive relief preventing any further investigation pursuant to the Formal Order or any enforcement action arising out of such investigation against Consensys.

114.    Consensys has no adequate remedy at law.

**Count Four**
**(Agency Action in Excess of Statutory Authority)**

115.    Consensys incorporates by reference all allegations above.

116.    The Declaratory Judgment Act, 28 U.S.C. § 2201, allows a party faced with a "genuine threat of enforcement" to bring suit to seek a declaration to determine the legality of an expected government enforcement action.  *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 129 (2007).  Consensys faces such a genuine threat here.

117.    The SEC staff told Consensys that it views the Swaps and Staking features of the MetaMask software as violative of the federal securities law.  Moreover, the staff stated that unless Consensys agrees to settle the threatened charges, it will pursue an enforcement action against Consensys.  Given the SEC's aggressive campaign of regulation-through-enforcement, there is no

question that these threats are genuine.  Accordingly, Consensys faces a genuine threat that the SEC will bring an enforcement action related to Consensys's MetaMask Swaps and Staking products.

118.    The SEC's position is contrary to the statute, precedent, and common sense.  A declaratory judgment action is therefore appropriate to allow Consensys to clear the considerable uncertainty and risk to its business generated by the SEC's threatened enforcement action.

119.    Consensys accordingly seeks declaratory and injunctive relief to prevent the SEC from subjecting Consensys to any unlawful investigation or enforcement action as to MetaMask.

120.    Consensys has no adequate remedy at law.

## PRAYER FOR RELIEF

121.    Consensys prays for an order and judgment:

A.    Declaring that ETH is not a security under the Securities Act and that Consensys's sales of ETH are not sales of securities under the Securities Act, and therefore that any investigation or enforcement action against Consensys premised on ETH transactions being securities transactions would exceed the SEC's authority;

B.    Declaring that an investigation or enforcement action against Consensys premised on ETH transactions being securities transactions would violate the requirement of fair notice under the Fifth Amendment's Due Process Clause of the United States Constitution;

C.    Declaring that the Commission's Formal Order violates the Administrative Procedure Act, and therefore that any investigation pursuant to the Formal Order is invalid and any enforcement action arising from such investigation would be invalid;

D.    Declaring that, by offering MetaMask Swaps and MetaMask Staking through its MetaMask wallet software, Consensys does not operate as a "broker" under the Exchange Act, and therefore that any investigation or enforcement action premised on Consensys operating as a "broker" under the Exchange Act through its MetaMask wallet software would exceed the SEC's authority;

E.    Declaring that Consensys does not, through MetaMask Staking, participate in the offering or sale of securities within the meaning of the Securities Act, and therefore any investigation or enforcement action premised on Consensys participating in the offering or sale of securities through MetaMask Staking would exceed the SEC's authority;

F.    Granting permanent injunctive relief prohibiting the SEC and its officers and agents from pursuing any investigation or enforcement action premised on ETH transactions being securities transactions, as exceeding the agency's statutory authority and violating the requirement of fair notice;

G.    Granting permanent injunctive relief prohibiting the SEC and its officers and agents from pursuing any investigation pursuant to the Formal Order of Investigation regarding "Ethereum 2.0," and any enforcement action arising out of such investigation, as violating the Administrative Procedure Act;

H.    Granting permanent injunctive relief prohibiting the SEC and its officers and agents from bringing or maintaining any investigation or enforcement action related to the Swaps or Staking features of its MetaMask software, as doing so would exceed the agency's statutory authority;

I.      Awarding Consensys its reasonable costs, including attorneys' fees, incurred in bringing this action under 28 U.S.C. § 2412, or other applicable law; and

J.      Granting such other and further relief as this Court deems just and proper.


Dated: April 29, 2024                  Respectfully submitted,

                                       */s/ Brant C. Martin*
                                       K. Todd Phillips (State Bar No. 24002767)
                                       Brant C. Martin (State Bar No. 24002529)
                                       Stafford P. Brantley (State Bar No. 24104774)
                                       WICK PHILLIPS GOULD & MARTIN, LLP
                                       100 Throckmorton Street, Suite 1500
                                       Fort Worth, Texas 76102
                                       Telephone: (817) 332-7788
                                       Facsimile: (817) 332-7789
                                       todd.phillips@wickphillips.com
                                       brant.martin@wickphillips.com
                                       stafford.brantley@wickphillips.com

                                       William Savitt (*pro hac vice* forthcoming)
                                       Kevin S. Schwartz (*pro hac vice* forthcoming)
                                       Sarah K. Eddy (*pro hac vice* forthcoming)
                                       Adam M. Gogolak (*pro hac vice* forthcoming)
                                       Daniel B. Listwa (*pro hac vice* forthcoming)
                                       WACHTELL, LIPTON, ROSEN & KATZ
                                       51 West 52nd Street
                                       New York, New York 10019
                                       Telephone: (212) 403-1000
                                       Facsimile: (212) 403-2000
                                       wdsavitt@wlrk.com
                                       kschwartz@wlrk.com
                                       skeddy@wlrk.com
                                       amgogolak@wlrk.com
                                       dblistwa@wlrk.com

                                       *Attorneys for Plaintiff*